IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| IN RE: | ) | |
|---|---|---|
| | ) | |
| LaGARDE, INCORPORATED, | ) | In Proceedings Under Chapter 11 |
| | ) | Case No. 08-22938 |
| Debtor. | ) | |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF DEBTOR'S EMERGENCY MOTION FOR ORDER PROHIBITING
UTILITIES FROM ALTERING, REFUSING OR DISCONTINUING
SERVICES AND COMMANDING UTILITY GREENSOFT SOLUTIONS, INC.
TO RESUME ESSENTIAL SERVICES TERMINATED OR CURTAILED
ON OR BEFORE THE PETITION DATE**

James F.B. Daniels, Fed. No. 70468
A. Jeffrey Misler, KS Bar #16383
605 West 47th Street, Suite 350
Kansas City, MO 64112-1905
(816) 753-5400 telephone
(816) 753-9996 telecopier
jdaniels@mcdowellrice.com
amisler@mcdowellrice.com

ATTORNEYS FOR DEBTOR

## SUMMARY OF ARGUMENT

In its Emergency Motion for an Order Prohibiting Utilities from Altering, Refusing or Discontinuing Services and Commanding Utility GreenSoft Solutions, Inc. to Resume Essential Services Terminated or Curtailed on or Before the Petition Date, debtor LaGarde Incorporated ("Debtor" or "LaGarde") demonstrated all of the following:

1. GreenSoft Solutions, Inc. ("GSI") is and has been a supplier to LaGarde of communication services and internet access of the kind known in the relevant industry as "web hosting";

2. The web hosting services provided to LaGarde by GSI are repackaged by LaGarde to include additional products and services and then resold to LaGarde's own customers, notably those customers who have purchased LaGarde's proprietary "StoreFront®" electronic commerce software;

3. The communication services/"web hosting" provided to LaGarde by GSI is necessary to LaGarde's business operation, LaGarde could not easily obtain comparable service from another provider; delays in obtaining substitute service and/or loss of service would be potentially fatal to LaGarde's ability to conduct business

4. There is, in effect, a "special" relationship between LaGarde and GSI. GSI is a "utility" within the meaning of 11 U.S.C. § 366 and GSI was and is prohibited from altering, refusing or discontinuing service to LaGarde, pending LaGarde's compliance with the "adequate assurance of payment" provisions of § 366(b);

5. Before the petition date, GSI terminated, without notice, a portion of the essential utility services provided to LaGarde and as a matter of law and GSI is required to restore that service, even without the prior receipt of adequate assurance of payment by LaGarde. Further,

GSI itself is liable to LaGarde for all compensatory damages sustained as a result of GSI's refusal to restore full service to LaGarde and by that refusal, GSI's willful violation of § 366(a) and for that matter, § 362(a);

6. In this Supplemental Memorandum, LaGarde will now show the Court the following:

    a. GSI provides web hosting and related communication services to LaGarde by contract;

    b. Although GSI purported to terminate that contract pre-petition, such termination was ineffective;

    c. That contract is and remains an executory contract within the meaning of 11 U.S.C. § 365 and GSI cannot refuse to perform under that contract;

    d. If GSI indeed refuses to perform pending assumption or rejection of the contract, its performance may be commanded by injunction; and

    e. Even assuming, *arguendo*, that GSI is not a utility and/or that the contract under which it has provided communication/web hosting services to LaGarde is not or is no longer an "executory contract", GSI is, at present:

        i. An essential supplier to LaGarde;

        ii. When offered administrative status for whatever services it supplies post-petition, GSI cannot refuse to provide such services either because LaGarde is "bankrupt" or because GSI wishes to extort payment of its pre-petition claim; and

        iii. If GSI persists in its refusal to provide post-petition services, it may be commanded, by injunction, to do so.

## STATEMENT OF FACTS

7. Prior to the Petition Date, LaGarde and GSI entered into successive "Enterprise Hosting" agreements.

8. Each of those Agreements contained an identical ¶ 3 entitled "**Term of Agreement**".

9. In ¶ 3, each of those Agreements provided that the "initial service term" thereof would begin on a denominated "Service Commencement Date" and that such term would continue for the period stated "in an attached Service Commitment Confirmation". That period was defined as the "**Initial Term**" of the "Enterprise Hosting" agreement.

10. In the context of ¶ 3, each "Enterprise Hosting" agreement provided, in addition, that GSI and LaGarde could "agree to one or more additional terms having a fixed number of months to follow expiration of the Initial Term" which extended period was identified as the "**Renewal Term**" of the "Enterprise Hosting" agreements.

11. Finally, in ¶ 3, each of the "Enterprise Hosting" agreements provided that "**[i]f upon expiration of the Initial Term no Renewal Term has been established by agreement of the parties, the Agreement shall automatically renew for successive terms of thirty (30) days each (each an EXTENDED TERM) until GSI or [LaGarde] provides the other with thirty (30) days advance notice of termination"**.

12. Although, in the form of an identical ¶ 13(c), each of these "Enterprise Hosting" agreements also permitted GSI to terminate the agreement "**without liability … upon fifteen (15) Business Days written notice should**" LaGarde become "overdue on the payment of any amount due under the Agreement", by its terms, that provision applied only to "**the Initial Term or Renewal Term**".

13. None of GSI's "Enterprise Hosting" agreements provided for the termination of any "**Extended Term**" <u>other</u> than upon thirty (30) days notice.

14. The "Enterprise Hosting" agreement entered into by GSI and LaGarde with respect to LaGarde's "StoreFront" operations expired some time in August, 2008.

15. No "**Renewal Term**" was agreed to by GSI and LaGarde and, accordingly, the "Enterprise Hosting" agreement for that, the most important aspect of LaGarde's business, entered into an "**Extended Term".** In effect, it became an agreement "from month to month".

16. On October 15, 2008, GSI informed LaGarde by e-mail that upon "receipt of this e-mail", GSI was "**no longer LaGarde's hosting service provider**".

17. A copy of that e-mail is attached to this Supplemental Memorandum as **EXHIBIT 1**.

18. As indicated in **EXHIBIT 1**, GSI immediately restricted "LaGarde's administrative access to LaGarde's shared and dedicated servers hosted at GSI", meaning that LaGarde [would] not be able to perform maintenance and administrative tasks on these devices or respond to their customers' issues that they may have with these devices. As GSI stated further, "**NO NEW EQUIPMENT SHALL BE ENABLED NOR WILL ANY CHANGES OR DELETIONS TO EXISTING EQUIPMENT OCCUR. ALL ADMINISTRATIVE CONTROL FUNCTIONS, INCLUDING BILLING, SHALL BE DISCONTINUED".**

19. Having disabled, *instanter*, LaGarde's access to and use and control of the over 800+ websites which LaGarde had created and sold to its own customers, GSI informed LaGarde that GSI's "hosted customers" would continue to receive "the provision of services" through the period ending October 31, 2008 in order "**to provide adequate time to notify said customers that LaGarde is no longer providing hosting services and to communicate GSI's information so customers can make arrangements to secure their data or arrange for alternative service".**

20. On October 30, 2008, GSI sent a further notice to LaGarde by e-mail.

21. A copy of that October 30, 2008 e-mail is attached hereto as **EXHIBIT 2**.

22. Pursuant to **EXHIBIT 2**, GSI informed LaGarde that it had "temporarily and voluntarily decided to reschedule the October 31, 2008 discontinuance of hosting services to November 15, 2008" provided, however, that if "LaGarde or any third party commence[d] any legal action against or involving GSI or its services, or involving any of LaGarde's assets on or prior to November 15, 2008, these voluntary services shall expire by their own terms upon the filing of such action and GSI shall immediately discontinue them".

23. On November 10, 2008, three (3) days after the Petition Date, GSI, through its attorney Daniel Langin, Esq., informed Mr. Daniel Minteer, Esq., counsel for Square 1 Bank, by voice mail that GSI intended "**to shut down LaGarde this afternoon**" and in that voice mail, attorney Langin expressed "**GSI's interest in purchasing the LaGarde customer list**" from Square 1 Bank.

24. Mr. Minteer's subsequent e-mail to attorney Langin dated November 10, 2008 summarizing the content of Langin's e-mail is attached as **EXHIBIT 3**.

25. Despite the entry of the Order for Relief on the November 7, 2008 Petition Date, GSI has continued to threaten to terminate all hosting services; GSI has refused to restore full access to the hosting services which LaGarde has, in turn, sold to its over 800 customers; and GSI has otherwise denied LaGarde access to its own billing system.

## ARGUMENT

**I. GSI PROVIDED COMMUNICATION/WEB HOSTING SERVICES TO LAGARDE BY CONTRACT; THAT CONTRACT IS AND REMAINS EXECUTORY NOTWITHSTANDING GSI'S ATTEMPTS TO TERMINATE IT AND GSI CAN BE COMMANDED BY INJUNCTION TO CONTINUE ITS PERFORMANCE UNDER THAT CONTRACT PENDING THE SOONER OF (A) THE ASSUMPTION OR REJECTION OF THAT CONTRACT UNDER 11 U.S.C. § 365 OR (B) THE EXPIRATION OF THE CONTRACT ACCORDING TO ITS TERMS**

26. As indicated in the preceding Statement of Facts, GSI and LaGarde were parties to one or more written "web hosting" agreements; each of those agreements was of fixed duration; each could and would expire according to its terms; in the event of expiration, the parties could renew the agreement for an agreed "**Renewal Term**" and if the parties did not, each contract would automatically extend for successive periods of thirty (30) days pursuant to a self-actuating "**Extended Term**".

27. At any time during the "**Initial Term**" as well as any agreed "**Renewal Term**", GSI could terminate these agreements in the event of non-payment by LaGarde. To do that, GSI was required to give LaGarde fifteen (15) "Business Days" notice.

28. Once these agreements had entered into an "**Extended Term**", however, they could not be terminated unless GSI provided LaGarde with "thirty (30) days advance written notice of termination".

29. GSI terminated LaGarde's administrative access to the hundreds of "StoreFront's" which LaGarde had created and itself hosted for hundreds of its customers, *instanter*, without notice on October 15, 2008.

30. No provision of any of GSI's "Enterprise Hosting" agreement allowed for such immediate termination, upon any grounds.

31. Further, since the agreement that applied to LaGarde's "StoreFront" business and customers was in its "**Extended Term**", no services of any kind could be terminated or curtailed with less than thirty (30) days written notice, just as no termination of any kind could occur without at least 15 "Business Days" notice.

32. There is no dispute that "[g]enerally a bankruptcy court may not extend a contract beyond its original terms" given that the "Bankruptcy Code neither enlarges the rights of a

debtor under a contract, nor prevents the termination of a contract by its own terms", In re Advent Corp., 24 B.R. 612, 614 (1st Cir. BAP 1982). Accordingly, where "a contract has been terminated pre-bankruptcy, there is nothing left for the debtor" whether to assume, under 11 U.S.C. § 365, or to claim as property of the estate under 11 U.S.C. § 541, Moody v. Amoco Oil Co., 734 F.2d 1200, 1212 (7th Cir. 1984).

33. At the same time, "[h]owever, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law", *Id*.

34. Where, among other things, "termination … was ineffective because notice was not given according to the terms of the" contract "prior to the filing of" the debtor's "bankruptcy petition", the contract is property of the estate and is subject to assumption or rejection under 11 U.S.C. § 365, In re Lonepine Corp., 184 B.R. 370, 372 (Bankr. D. Colo. 1995).

35. Because GSI purported to terminate much of LaGarde's service, *instanter*, without notice of any kind and to terminate the remainder without the 30 days notice which, under its own "web hosting" agreements was a prerequisite to termination during an/the "**Extended Term**", indeed without the 15 "Business Days" notice required for any species of termination, the purported termination is void and of no effect.

36. As a result, the "Enterprise Hosting" agreement between LaGarde and GSI which is now in its month-to-month "**Extended Term**" remains in effect and will remain in effect unless or until it is rejected by LaGarde under 11 U.S.C. § 365 or expires by its terms, or GSI obtains leave of this Court to terminate it under 11 U.S.C. § 362(d).

37. An "executory contract generally remains in effect pending assumption or rejection by the debtor-in-possession", In re National Steel Corp., 316 B.R. 287, 305 (Bankr. N. D. Ill. 2004). Further, "most courts agree that before an executory contract is assumed or

rejected under § 365(a), that contract continues to exist, enforceable by the debtor-in-possession, but not enforceable against the debtor-in-possession", *Id*. That means that "[t]he non-debtor party must continue to perform under the contract prior to assumption or rejection, but the debtor-in-possession is not bound by the provisions of the executory contract unless the contract is subsequently assumed", *Id*. After all, if "a non-debtor party could unilaterally cease performance on an executory contract, the powers provided to a debtor under § 365(d) would have no meaning", In re Nut Co., 1996 WL 596731, *3, Bankr. N. D. Ill., No. 94 B 5993 (October 16, 1996).

38. In short, during "the pre-assumption period … 'the executory contract remains in effect and creditors are bound to honor it'", In re Travelot Co., 286 B.R. 462, 466 (S. D. Ga. 2002), *quoting in part from* In re Public Service Co. of New Hampshire, 884 F.2d 11, 14 (1st Cir. 1989).

39. Further, since the contract remains "in effect" until the debtor makes "its decision to assume or reject the contract" where the non-debtor party has "terminated its own performance" by, for example, refusing to provide "essential computer services", the "bankruptcy court [has] the authority to preserve the status quo until" the debtor indeed makes its assumption/rejection decision by issuing a "restraining order" commanding the non-debtor party to perform, In re Whitcomb & Keller Mortgage Co., Inc., 715 F.2d 375, 378 (7th Cir. 1983).

40. It is no less clear that where a "debtor-in-possession" does elect "to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract", the debtor "must, nevertheless, pay for the reasonable value of those services", In re Travelot, 286 B.R. at 466, *citing* N.L.R.B. v. Bildisco, 465 U.S. 513, 531, 104 S. Ct. 188, 79 L.Ed.2d 482 (1984).

41. In <u>this</u> case, LaGarde is entitled to an order commanding GSI to restore and continue full "Enterprise Hosting" services to LaGarde for a period of fully thirty (30) more days, if not longer. That, despite any showing by GSI that it is not otherwise a "utility" within the meaning of 11 U.S.C. § 366.

42. For all of these reasons, GSI's purported termination prior to the Petition Date of what are and remain executory contracts was ineffective.

## II. AS A SUPPLIER ESSENTIAL TO A SUCCESSFUL REORGANIZATION BY LAGARDE, GSI MAY BE COMMANDED TO RESUME AND CONTINUE ITS PERFORMANCE UNDER THE "ENTERPRISE HOSTING" AGREEMENTS, EVEN IN THE EVENT THAT THOSE AGREEMENTS ARE NO LONGER AMENABLE TO ASSUMPTION UNDER 11 U.S.C. § 365 AND EVEN IF GSI IS NOT OTHERWISE A "UTILITY" WITHIN THE MEANING OF 11 U.S.C. § 366

43. LaGarde's prospects for an effective reorganization are squarely in the hands of GSI.

44. A perilous position, indeed, given the fact that GSI is actually a competitor of LaGarde; that GSI has hired many of LaGarde's employees in violation of GSI's own "Enterprise Hosting" agreements; that GSI has tried to "buy" all of LaGarde's customers from LaGarde's pre-petition financier and that nearly thirty (30) days ago, GSI **disabled LaGarde from serving its customers, prevented LaGarde from <u>moving</u> its customers' websites to other carriers where their hosted sites would be free from any threat of interruption, and denied LaGarde access to its own billing system**.

45. That GSI, which is on the very cusp of usurping all of LaGarde's business and customers, would refuse to provide post-petition service to LaGarde is hardly surprising.

46. Fortunately, the bankruptcy courts have already determined how best to deal with creditors like GSI.

47. Conduct like GSI's, not only "affects" the debtor "but also affects [the] debtor['s] estate and ultimately the creditors", In re Fast Mart Convenience Stores, Inc., 296 B.R. 414, 422 (Bankr. E. D. Pa. 2002). GSI's refusal to continue to provide essential services to LaGarde, even in exchange for administrative treatment of its ensuing claim for the value of those services "will certainly affect the percentage payout to unsecured creditors by negatively impacting debtor['s] value to potential purchasers", *Id*. at 423.

48. In fact, it could result in the attrition of LaGarde's customer base to the extent that LaGarde will become unsaleable. Certainly it will be unsaleable to Dydacomp, the entity that is, even now, ready, willing and able to purchase LaGarde's assets for a purchase price that if fully realized would be sufficient to pay all or a substantial part of the claims of unsecured creditors. Under these facts and circumstances, other courts have issued their own temporary restraining orders <u>commanding</u> the recalcitrant supplier to perform, *Id*. at 423; In re Blackwelder Furniture Co., Inc., 7 B.R. 328, 341 (Bankr. W. D. N. C. 1980) and *see also*, In re Misty Touch, Inc., 31 B.R. 853 (S. D. N. Y. 1983). This Court may and should so likewise with respect to GSI.

## CONCLUSION

As demonstrated above, the issue whether GSI is or is not a "utility" for purposes of § 366 is not dispositive of LaGarde's request for relief. GSI is, for all of the reasons noted, a non-debtor party to an as-yet unterminated executory contract, performance under which may be <u>commanded</u> by injunction if it is not forthcoming from GSI. Likewise, even in the event that all executory contracts for these services were terminated or otherwise expired before the petition date, GSI may, as an essential supplier, be commanded to perform in exchange for an administrative claim equal to the value of its performance.

McDOWELL RICE SMITH & BUCHANAN

   /s/ *A. Jeffrey Misler*
James F.B. Daniels, Fed. Bar #70468
A. Jeffrey Misler, KS Bar #16383
605 West 47th Street, Suite 350
Kansas City, MO 64112-1905
(816) 753-5400 telephone
(816) 753-9996 telecopier
jdaniels@mcdowellrice.com
amisler@mcdowellrice.com

ATTORNEYS FOR DEBTOR

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that a true and correct copy of the above and foregoing was served this 12th day of November, 2008 to those persons requesting electronic notification.

   */s/ A. Jeffrey Misler*